**E-FILED**
Wednesday, 04 December, 2013  10:53:47 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | |
|---|---|
| **KRYSTAL MOORE on behalf of** )<br>**herself, on behalf of JA'QUAN TERRELL** )<br>**SMITH (a minor, deceased), JA'QUAY** )<br>**TERRENCE SMITH (a minor, deceased),** )<br>**and TERRENCE SMITH** )<br> )<br>**Plaintiffs,** )<br>**v.** )<br> )<br>**KANKAKEE COUNTY; JACQUELINE** )<br>**D. HARCAR; DAVID SHULTZ; IVETTA** )<br>**CHAREE SANGSTER; MARTY** )<br>**CALLOWAY, JR.; DEAN DYER;** )<br>**SABRINA FLOWERS; DR. CLYDE** )<br>**DAYHOFF; DR. JEFF LONG and** )<br>**SHERIFF OF KANKAKEE COUNTY** )<br>**TIMOTHY F. BUKOWSKI,** )<br> )<br>**Defendants.** ) | **Case No. 12-CV-2002** |

## OPINION

Defendants filed this Partial Motion for Summary Judgment (#97) on July 1, 2013. Plaintiffs filed their Response (#101) to the motion on August 8, 2013. Defendants filed their Amended Reply (#122) on September 12, 2013. The motion is now fully briefed and ready for judgment. For the following reasons, Defendants' Partial Motion for Summary Judgment (#97) is GRANTED in full.

## BACKGROUND

*Factual Background*

<u>The Parties</u>

Plaintiff Krystal Moore, at all relevant times in this case, was detained in the Flex Housing

Unit at the Jerome Combs Detention Center (JCDC) in Kankakee, Illinois. Plaintiff Terrence Smith[1] was the father of the twins that Plaintiff Moore was carrying. Defendant Sheriff Timothy Bukowski was responsible for the operation of the JCDC. Defendants Dr. Clyde Dayhoff and Dr. Jeffrey Long were two of the Medical Directors at the JCDC. Defendant Ivetta Charee Sangster was a Licensed Practical Nurse (LPN) employed by the JCDC. Defendant Cpl. Sabrina Flowers was the supervising correctional officer assigned to booking at JCDC. Defendants Jacqueline Harcar, David Schultz, Marty Calloway, and Dean Dyer were correctional officers at the JCDC. Additionally, Calloway was assigned to booking and Dyer was a "first responder."

<u>The Incident</u>

On September 11, 2011, Plaintiff was 22 to 24 months pregnant with twins. This was Plaintiff's first pregnancy. Plaintiff testified during her deposition that she had begun experiencing pain through her back and stomach during the early morning hours of September 11 and complained to cellmate Kenyatta Williams of the pain. Alicia Hunter was housed in the cell next to Plaintiff and heard Plaintiff requesting aid early in the morning of September 11 by pushing the intercom button. The intercoms connect inmates to the correctional officers working in the housing units. At five or six o'clock that morning Plaintiff told Hunter that she was still in pain. Hunter pressed the intercom in her cell to summon aid, but a male correctional officer (unidentified) on the other end of the intercom told her to mind her own business. After the cell doors opened at 8:00 a.m., Hunter took

---

[1]For simplicity's sake, Krystal Moore will be referred to as "Plaintiff" from this point forward. Although Terrence Smith, Ja'Quan Terrell Smith (deceased), and Ja'Quay Terrence Smith (deceased) are all named plaintiffs in this matter, any further use of "Plaintiff" in this Opinion exclusively refers to Krystal Moore.

a shower and then went to Plaintiff's cell to look in on her.  Hunter saw Plaintiff balled up on the bed.

Defendant Officer Harcar stated that she first became aware of Plaintiff's complaints of stomach pain sometime after 9:30 in the morning.[2]  Plaintiff disputes Harcar's claim, arguing that, due to visual inspections conducted by the correctional officers, Harcar would have become aware of Plaintiff's situation before 9:30.  Harcar was on shift in Flex from 6:45 a.m. to 3:15 p.m. and was obliged to report to her housing unit by 7:15.  Harcar had previously interacted with Plaintiff while Plaintiff was in the JCDC.  Harcar was not aware of Plaintiff having a bad reputation at JCDC before September 11, 2011.  Plaintiff claimed that she told Harcar she thought she was in labor and needed to go to the hospital.  Harcar denied that Plaintiff told her she thought she was in labor.  Kenyatta Williams told Harcar that morning that Plantiff was having contractions.  Harcar knew that Plaintiff was pregnant with twins and believed Plaintiff to be five to six months in to her pregnancy.

Harcar asked Defendant Officer Schultz to contact Defendant Cpl. Flowers about Plaintiff's complaints.  Schultz was also on shift in Flex from 6:45 a.m. to 3:15 p.m., during which he was supposed to perform a check every 30 minutes.   During the check officers must hit an electromagnetic sensor with a wand and do a visual scan of each cell.  Kenyatta Williams claims she

---

[2]This issue is disputed by the parties.  Plaintiff claims, based on the cell housing history attached to her Response (#101) as Exhibit O, that she was housed in Cell A1 on September 11, 2011, and thus Defendants Harcar and Schultz would have seen her during their checks from 7 a.m. to 9:30 a.m., and would have been aware of her condition long before 9:30.  Defendants dispute this assertion, noting that, based on the deposition testimony of Williams and Hunter, Plaintiff was moved from A1 (a lower tier cell) to the upper tier, where she was housed on September 11, 2011, in a cell with Kenyatta Williams.  Defendants also dispute Plaintiff's assertion that the Flex pods layout allowed guards at the officers' station to see into Plaintiff's cell when sitting at the station.  Harcar testified that guards could not see into Plaintiff's cell from the station.

saw Schultz standing in Plaintiff's doorway between 8:00 and 8:30 a.m.  At this time she could also see Plaintiff.  Schultz knew that Plaintiff was pregnant, but did not himself know how far along Plaintiff was in her pregnancy.  Schultz had been told that Plaintiff was "probably" six months pregnant.  Schultz admitted that Plaintiff asked to go to the hospital.  At around 9:36 a.m. Schultz contacted booking and informed Defendant Officer Dyer, a first responder, that a pregnant inmate was complaining about stomach pain.  A first responder is a correctional officer who has been trained to take vitals, including pulse, blood pressure, and temperature and to recognize and assess some kinds of emergency situations.

Dyer informed Flowers about Plaintiff's complaint.  Flowers instructed Schultz to call the nurse because Flowers knew Defendant Nurse Sangster was at the JCDC that morning.  Sangster was at the JCDC that morning for a few hours and was on-call along with Registered Nurse Heather Gill for the remainder of the day.  Sangster was on call 24 hours a day, seven days a week, and if officers had a medical issue, she was contacted.  Schultz called the medical department as instructed, but Sangster was not there.  He called around to other housing units and was eventually able to speak to Sangster about Plaintiff's complaints.  Schultz did not recall the specifics of his conversation with Sangster, but the nurse did not inform him that this was an emergency situation. Schultz saw Plaintiff walking around the housing unit throughout his shift and she did not appear, to Schultz at least, to be in any distress.  Flowers spoke with Sangster face to face while she was still in the jail that morning.  Sangster told Flowers that she was aware of Plaintiff's situation, that there was nothing wrong, and that Plaintiff would be seen the following day by the doctor.  Flowers did not see or speak with Plaintiff at all on September 11, 2011.

At some point during the morning, before 11:30, Plaintiff asked Williams to call her mother. Williams called Julie Moore, Plaintiff's mother, and asked her to call the prison because Plaintiff was having pains and wanted to go to the hospital. Julie Moore called the prison and spoke with Dyer. Moore informed Dyer that Plaintiff was having pains, that it could be contractions, and that she probably needed to go to the hospital because it was too early to have the children. Dyer told Moore that he had a call in to the nurse and they were supposed to be coming out. Moore asked if a nurse was on her way to see Plaintiff, and Dyer answered in the affirmative.

Shortly before 11:30 am, Plaintiff complained to Harcar about continued pain. Harcar then contacted Flowers and informed her that she needed a first responder to come to Flex because Plaintiff was complaining about stomach pain. Flowers told Harcar that Sangster said nothing was wrong with Plaintiff. Flowers told Harcar to tell Plaintiff that "she can stop calling her mama because her mama can't do nothing up in here." Flowers knew that Julie Moore had called in to the facility and said that Plaintiff was having stomach pains and needed to go to the hospital. Harcar told Flowers that Plaintiff did not appear to be in any distress. Harcar told Plaintiff to try and relax. Harcar related to Plaintiff that she (Harcar) had previously been pregnant with twins and knew that at times it could be uncomfortable.[3] Harcar told Plaintiff that her body was going to go through some changes and pain while carrying two babies. Harcar allowed Plaintiff to stay out of her cell so she could try to get comfortable.[4] Harcar also allowed inmates Kenyatta Williams and Alicia Hunter to stay with Plaintiff.

---

[3] Both Harcar and Flowers had experienced childbirth.

[4] The inmates of the upper and lower tiers of Flex Pod A alternate being allowed to leave their cells and use the dayroom. Normally, each tier is allowed out for two hours and then the inmates are locked up.

Flowers directed Dyer to go to the Flex Housing Unit and provide first responder services to Plaintiff.  However, before going to the housing unit Dyer called Sangster, who was no longer at JCDC.  Dyer, who had just spoken to Plaintiff's mother, informed Sangster that Plaintiff was complaining about stomach pain.  Their conversation was as follows:

"Dyer: Okay.  And the next thing I have is a female down in Flex, pregnant, states she's having stomach pains.  Her mom called here, said she called home, said we wouldn't do nothing about it, and she thinks she's having contractions.

Sangster: She's not having any bleeding or anything; is she?

Dyer: I'm going down to first respond her now.

Sangster: Yeah, they called me when I was out there actually about her.  Krystal Moore, she's  – in my opinion, a lot of times she's full of shit.  She don't even want to take her prenatal vitamins for the baby.[5]  You know what I'm saying?

Dyer: Okay.

Sangster: And now you talking about she having stomach cramps.  You can go eyeball her and call me back if you want.  She's probably full of shit.  But you can let her know that she can see the doctor tomorrow if she'd like.  Actually, she was scheduled to see him, but refused.  So if she doesn't– take her blood pressure.  If she doesn't appear to be in any serious distress, she's going to wait until tomorrow.

Dyer: Okay.

Sangster: All right.  Thanks.

---

[5]Plaintiff had her own prenatal vitamins prescribed for her by Dr. Renuka Ramakrishna.

Dyer: Uh-huh.

Sangster: All right.  Bye."

Dyer then went to the Flex Housing Unit with Calloway.  Kenyatta Williams was  with

Plaintiff while Dyer and Calloway were in the Flex unit.  Dyer took Plaintiff's vitals, which were

all within the normal range.  Dyer asked Plaintiff if she was bleeding and she told him that she was

not.  Plaintiff claims that she told Dyer that she thought she was in labor.  Plaintiff did not ask to

speak with Calloway.  Plaintiff did not look to be in distress to either Dyer or Calloway while they

were in the Flex Housing Unit with her[6].  Neither Dyer nor Calloway had any further contact with

---

[6]This version of events is disputed by Hunter and Williams in their affidavits filed with
Plaintiff's Response (#101, Exhibits I and B).  Williams avers that Dyer seemed rushed and that
he ignored  Plaintiff when she told him that she thought she was in labor and needed to go to the
hospital.  Dyer also ignored Plaintiff's complaints that the blood pressure cuff he was using on
her did not work properly.  When Dyer and Calloway were in Flex, Williams avers Plaintiff was
rocking back and forth crying and Dyer never asked if she was having contractions.  Further,
during lunchtime, Plaintiff was in the dayroom with Williams and in full view of Hunter, who
saw Plaintiff crying and twisting around to get more comfortable.  Around noon, according to
Hunter, Harcar ordered Hunter to stay with Plaintiff, whom she was with until approximately
2:40.  Hunter, as an inmate, is familiar with the layout of the Flex Pods and JCDC, and avers that
Plaintiff would have been in full view of the guard station where Schultz and Harcar would have
been sitting while Plaintiff was in the dayroom.
    Defendants dispute this, pointing to the deposition testimony of Williams that she could
not recall the nature of the blood pressure disagreement, nor did Williams or Hunter mention that
Plaintiff was "rocking back and forth" in front of Dyer.  Williams further testified that she did
not remember any conversation that Plaintiff had with Dyer, besides the blood pressure
disagreement.  Further, Defendant acknowledges that while Plaintiff was in the dayroom with
Williams in full view of Hunter when lunch came, it notes that, in Hunter's deposition, Hunter
made no mention of Plaintiff rocking back and forth and crying or twisting around to get more
comfortable.  Defendants also note that Williams testified that there was nothing else that she
told Plaintiff's attorney or a reporter that she had not mentioned during the deposition.
Defendants also note that there is no evidence that Harcar and Schultz were in the guard station
at the time Hunter alleges, and that Hunter's affidavit statement also assumes, without personal
knowledge, that Harcar and Schultz would have been sitting in the station at all times.
    Under Seventh Circuit case law, "'[w]here a deposition and affidavit are in conflict, the
affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was
mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of

Plaintiff that day.  Dyer informed Harcar that Plaintiff's vitals were all within the normal range and that she did not look to him to be in any distress.  Williams testified that Dyer and Plaintiff had a disagreement about the blood pressure cuff, but she did not remember the nature of the disagreement.  Dyer also informed Flowers that Plaintiff's vitals were fine.

After this incident, Plaintiff called her mother Julie Moore and told her she was in pain and was afraid she was in labor.  Plaintiff told her mother she knew it was contractions and that the pain was going down to her private parts.  Plaintiff was in tears while speaking to her mother.  No nursing staff or doctors came to visit with Plaintiff that day.  Dyer was in contact with Sangster throughout the day and he was the only first responder that went to see Plaintiff.  Schultz had no training on how to assess whether a woman was in labor, but he was trained to contact a first responder or medical staff member, as were the other correctional officers.  The correctional officer Defendants did not have training on how to assess a pregnant inmate.  Harcar was aware that Sangster was only a LPN and stated, in her deposition, that "I know an LPN can only do so much...an LPN is pretty much...the RN's little flunky basically [the RN] tells [the LPN] what to do."

Sangster testified as follows about her training with regard to pregnancy:

"Attorney: Okay. When you were trained as an LPN, what sort of training did you receive regarding assessing pregnancy?

---

memory is in the circumstances a plausible explanation for the discrepancy.'" *Amadio v. Ford Motor Company*, 238 F.3d 919, 926 (7th Cir. 2001), quoting *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995).  Therefore, as Plaintiff has not shown how the statements in the deposition were mistaken, the court will not consider those statements in the affidavits in conflict with deposition testimony.

Sangster: Just like you would assess anyone else, other than asking them about their last period, if they've had any problems with the pregnancy, if they're currently having issues.

Other than that, you assess them as you would anybody else.

Attorney: So, am I correct to say that when you received your LPN training you didn't receive any other training regarding a person in labor?

Sangster: Specific training?  Just assessing someone as far as if they appear to be in distress, checking their vitals, any nausea, vomiting, things of that nature.

Attorney: Uh huh.

Sangster: Any bleeding.

Attorney: Okay.  So as an LPN, in your training, you didn't – strike that.  As an LPN, you were not trained to assess whether or not a person was actually experiencing contractions or not?

Sangster: That – whether or not a person is experiencing contractions, I have to go by what they tell me. I mean, that's all I can go by, is how they appear to be to me.

Attorney: Well, meaning if you had personally – if you say put your hand on the stomach of a woman who is experiencing contractions, you know, it is a possibility to feel a hardening of the stomach area, isn't it?

Sangster: It's possible.

Attorney: If I might ask, have you ever experienced pregnancy yourself?

Sangster: Yes, I have."

-9-

Between noon and 2:40, Hunter told Harcar and Schultz that Plaintiff was in pain and needed to go to the hospital.  Hunter told Schultz that Plaintiff was saying her butt was hurting.  Schultz told Hunter that Plaintiff was "not going to have the baby out of her ass."  Hunter told Schultz that when she was in labor she could not always tell where she was hurting.  Schultz ignored her by doing something on the computer.  In her affidavit, Hunter averred that every time she tried to speak with Harcar or Schultz about Plaintiff they seemed to be preoccupied and bored, and they did not want to take any action to help her.[7]

Between 2 and 2:45 p.m. Hunter went with Plaintiff back to her cell because Plaintiff needed to use the restroom.  Hunter saw Plaintiff sit on the toilet and then start screaming.  Hunter saw Plaintiff pass a lot of blood, which was collected on a sanitary pad.  Hunter began telling Plaintiff not to push.  Sometime after 2:30 an inmate yelled out to Harcar that Plaintiff was bleeding.  Harcar ran to Plaintiff's cell and observed her sitting on the toilet.  Plaintiff showed Harcar a sanitary pad with blood on it.  Harcar told Schultz to contact booking to advise Flowers that Plaintiff was bleeding.  Schultz contacted booking, reaching Dyer, and informed him that Plaintiff was bleeding.  At about 2:47 p.m. Dyer contacted Sangster by telephone and advised her that Plaintiff was now bleeding.  Sangster instructed Dyer that Plaintiff needed to be taken to the hospital.  Dyer told Flowers that Sangster directed them to take Plaintiff to the hospital.  Officers from the next shift (not Defendant correctional officers) were assigned to take Plaintiff to the hospital.  The transport officers did not bring a wheelchair with them.  Plaintiff was required to walk herself down the stairs and out of the cell.  Plaintiff was fully dilated when she arrived at Provena St. Mary's hospital,

---

[7]Defendants dispute this, noting that, in her deposition, Hunter did not testify that Harcar and Schultz seemed to be preoccupied or bored, but that, in fact, Harcar did try to help and show Plaintiff different ways to sit and little things to make herself more comfortable.

which was located approximately ten miles from JCDC.  Plaintiff was subsequently transported to a Kankakee hospital, where Dr. Renuka Ramakrishna, Plaintiff's obstetrician, delivered the twins around 5:20 p.m.  The twins later died in a Chicago hospital.[8]

### County Procedures and Policy

The Kankakee County Detention Center Policy and Procedure Manual ("Policy Manual") Section 601 (Medical Services Administration) provides that all medical personnel, including nurses, must be licensed, registered, or certified in their respective fields and only perform duties within the scope of their particular license.  Policy Manual Section 617 (Pregnancy/Prenatal Policy) provides that in case of an emergency with a pregnant inmate, correctional officers are to notify their shift supervisors and the on-call nurse if medical personnel are not present at the jail.  The medical department will determine whether the inmate should be sent to a local hospital.  Policy Manual Section 625 (Nurse On-Call) provides that health staff will be on site at the jail on Saturdays, Sundays, and holidays, as needed.  Otherwise, on-call nurses are available at that time.  It further requires an on-call nurse to contact a Physician Assistant or physician with any questions or guidance, as needed.  An on-call nurse is also required to contact the on-call physician to discuss inmate needs and medical decision making, as needed.  A supervisor may send an inmate to the hospital in case of an obvious, immediate emergency.  As part of the JCDC "Standing Orders," JCDC policy is to call 911 in cases of imminent delivery of a baby.

---

[8]Plaintiff has included, as Exhibits V and Y to her Response (#101), the expert reports of Drs. Mark Loafman and Jonathan K. Muraskas concerning the reasons for the twins' deaths and commenting on the actions of Defendants.  However, while both reports are signed, the expert reports were introduced into the record without any supporting affidavit verifying their authenticity and are therefore inadmissible and cannot be considered for purposes of summary judgment.  *Scott v. Edinburg*, 346 F.3d 752, 759-60 (7th Cir. 2003).

Plaintiff's expert Dr. Jacqueline Moore, an expert in the field of prison nursing and healthcare, averred that because JCDC utilized an "on-call" system, where medical personnel were usually only available by telephone on the weekends, it was imperative to have at least one guard on duty, immediately available and trained to assess whether Plaintiff was in labor.  Dr. Moore further averred that the training in question for guards regarding pregnancy should have, at a minimum, included: the timing of contractions, knowledge of the typical pattern of contractions, feeling the pregnant woman's stomach to see if it is hardening and knowing what questions to ask. Examples of such questions are "where exactly does it hurt?," "does the pain ever stop or get better?" and "does moving around walking or repositioning stop the pain?"

Defendants, in regard to the on-call system, note that Dr. Moore testified in her deposition that she did not read the Illinois County Jail Standards under the Illinois Administrative Code in preparation for this case, although she had read them before.  Further, Defendants note that in her deposition Dr. Moore took issue not with JCDC's policy regarding treatment of pregnant inmates and medical personnel authority, but rather with how those policies were carried out in this particular case.  She also testified that she did not have a problem with the JCDC's policy of contacting the on-call nurse, but rather with Sangster's decision.  Dr. Moore also did not review any of the correctional officer Defendants' depositions, but that it was her "understanding" from Sangster's and Nurse Gill's depositions "that the officers received no training in the care of pregnant women."

<u>Plaintiff's Complaint</u>

Plaintiff filed her Fourth Amended Complaint (#92) on May 23, 2013.  The complaint contained eight counts.  Count I, against the correctional officer Defendants and Nurse Sangster,

alleged failure to provide adequate medical care under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. Count II, a claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978) under the Constitution and § 1983, against Defendants Bukowski, Dayhoff, and Long, alleged that the JCDC's customs, practices, or policies permitted or encouraged the misconduct complained of in this case. Counts III and IV alleged claims of wrongful death regarding Ja'Quay and Ja'Quan Smith against the correctional officer Defendants and Sangster. Counts V and VI allege "loss of society" of the decedent twin Plaintiffs due to the inadequate medical care received by Plaintiff. Those counts do not specifically list who they are alleged against. Count VII is a "pendent state law claim for medical malpractice" against Sangster. Count VIII is an indemnification count seeking, in the event that any individual Defendant is found liable for his or her actions performed in the course of his or her employment, that Kankakee County indemnify the employee for the verdict.

Defendants filed this Partial Motion for Summary Judgment (#97) on July 1, 2013. Plaintiffs filed their Response (#101) to the motion on August 8, 2013. Defendants filed their Amended Reply (#122) on September 12, 2013. The motion is now fully briefed and ready for judgment.

## ANALYSIS

Defendants make five arguments in their Motion for Partial Summary Judgment (#97): (1) the correctional officer Defendants are entitled to qualified immunity on Plaintiff's § 1983 Fourteenth Amendment claim as alleged in Count I of the Fourth Amended Complaint; (2) Defendants Sheriff Bukowski and Drs. Dayhoff and Long are entitled to summary judgment on Plaintiff's municipal policy (*Monell*) claim as alleged in Count II of the Complaint; (3) the correctional officer Defendants are entitled to summary judgment on Plaintiff's wrongful death

claims as alleged in Counts III and IV of the Complaint; (4) all Defendants are entitled to summary judgment on Plaintiff's loss of society claims as alleged in Counts V and VI of the Complaint; and (5) the correctional officer Defendants are entitled to summary judgment on Plaintiff's medical malpractice claim as alleged in Count VII of the Complaint. Each of these arguments will be addressed in turn.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. See *Singer*, 593 F.3d at 533. In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

-14-

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

I.     *Whether the Correctional Officer Defendants Had Qualified Immunity*

Count I of Plaintiff's Fourth Amended Complaint (#92) alleges that the correctional officer Defendants and Nurse Sangster "deliberately, recklessly, willfully, and wantonly ignored the obvious serious medical needs and requests for medical treatment" of Plaintiff and the "substantial risk of serious injury and death, and failed to take appropriate steps to protect" Plaintiff, constituting a violation of Plaintiff's Fourteenth and Eighth Amendment rights. The Complaint also alleges that correctional officer Defendants were "deliberately indifferent" to Plaintiff's medical needs by allowing Sangster to make treatment decisions regarding her pregnancy. Defendants move for summary judgment on Count I for the correctional officer Defendants, arguing that they are entitled to qualified immunity.

"Governmental actors performing discretionary functions are entitled to qualified immunity from suits for damages 'insofar as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known.'" *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 713 (7th Cir. 2013), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "'Qualified immunity balances two important interests- the need to hold public officials accountable

when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Abbott*, 705 F.3d at 713, quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity protects all but the plainly incompetent, and if officers of reasonable competence could disagree on the issue of whether or not the act in question was constitutional, immunity should be recognized. *Gruenberg v. Gempeler*, 697 F.3d 573, 578 (7th Cir. 2012). "To overcome the defendant's invocation of qualified immunity, the plaintiff must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott*, 705 F.3d at 713. Once the qualified immunity defense is raised, the burden is on the plaintiff to defeat the defense and show that she had clearly established rights that the defendant violated. *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012).

The court will first address whether the correctional officer Defendants violated Plaintiff's constitutional rights. Plaintiff argues that correctional officer Defendants violated her Eighth Amendment right to be free from cruel and unusual punishment, via the Fourteenth Amendment's application to pretrial detainees and incarcerated individuals, when they "all contributed to, or knowingly failed to prevent, the violation of [Plaintiff]'s constitutional rights, when [Plaintiff was] repeatedly denied access to proper medical attention and pain relief, potentially endangering" Plaintiff's life and causing the death of her twin infants. "[P]rison officials have a duty to 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Estate of Miller, ex rel. Bertram v. Tobiasz*, 680 F.3d 984, 989 (7th Cir. 2012), quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In determining whether an inmate's rights were violated by a deprivation, the court must examine the alleged violation both objectively and subjectively, in that: (1) the deprivation

must be objectively, sufficiently serious; and (2) the mental state of the prison official must have been one of deliberate indifference to inmate safety. *Miller*, 680 F.3d at 989. Under the first prong, when a claim is based on a failure to prevent harm, the plaintiff must show that the inmate was incarcerated under conditions posing a serious risk of substantial harm. *Miller*, 680 F.3d at 989. Under the second prong, "deliberate indifference," "'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Miller*, 680 F.3d at 989, quoting *Sanville v. McCaughtry*, 266 F.3d 724, 734 (7th Cir. 2001), quoting *Farmer*, 511 U.S. at 837.

A.      Was Plaintiff's Condition Objectively, Sufficiently Serious

The court must first determine whether Plaintiff's condition was "sufficiently serious" enough to qualify as a serious medical need, which is an objective standard. *Miller*, 680 F.3d at 989; *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997) ("In the medical care context, the objective element requires that the inmates medical need be sufficiently serious."). In *Gutierrez*, the Seventh Circuit noted:

>     "A 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. [citations omitted]
>
>     Similarly, the Ninth Circuit regards a medical condition to be 'serious' where 'the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,' *McGuckin v. Smith*, 974 F.2d 1050,

-17-

1060 (9th Cir. 1992) [], and considers the following to be indications that a prisoner has a serious medical need: 'The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." [*McGuckin*, 974 F.2d] at 1059-60." *Gutierrez*, 111 F.3d at 1373.

Here, Plaintiff was around six months pregnant with twins. A woman who is pregnant with twins is inherently at a greater risk for complications. Defendants did not address the objective prong in either their Partial Motion for Summary Judgment or their Reply. Based on the factors elucidated by the Seventh Circuit in *Gutierrez*, the court finds that the objective prong has been met, and that being in the third trimester of a pregnancy with twins constitutes "a serious medical need," in that it is a medical condition that significantly affects an individual's daily activities and is a condition that a reasonable doctor or patient would find important and worthy of comment or treatment. See *Gutierrez*, 111 F.3d at 1373.

B.      Whether the Correctional Officer Defendants Were Deliberately Indifferent to Plaintiff's Safety

The court must decide whether Plaintiff has presented sufficient evidence of deliberate indifference on the part of the correctional officer Defendants to survive a motion for summary judgment. "To demonstrate that a defendant acted with a 'sufficiently culpable state of mind,' a plaintiff must put forth evidence to establish that the defendant knew of a serious risk to the prisoner's health and consciously disregarded that risk." *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012), quoting *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006).

"This subjective standard requires more than negligence and it approaches intentional wrongdoing. [citation omitted] The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Holloway*, 700 F.3d at 1073, citing *Farmer*, 511 U.S. at 837.  The Seventh Circuit has "characterized the standard as imposing a high hurdle on plaintiffs because it requires a 'showing of something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012), quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006).  Even if officials are aware of a substantial risk of serious harm, they are not liable if they "responded reasonably to the risk, even if the harm ultimately was not averted." *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002), quoting *Farmer*, 511 U.S. at 843.

The Seventh Circuit has held that non-medical defendants may rely on the expertise of medical personnel and that if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.  *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011).  However, non-medical officials can be charged with deliberate indifference where they have a reason to believe that prison doctors or their assistants are mistreating (or not treating) a prisoner, and non-medical personnel cannot simply ignore an inmate's plight.  *Arnett*, 658 F.3d at 755.  Mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient, however, and the plaintiff must demonstrate that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety.  *Arnett*, 658 F.3d at 755; See *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005) (finding that non-medical defendant may have been deliberately indifferent if he had ignored inmate's complaint entirely, but deliberate indifference not shown where defendant investigated the complaints and referred them to the medical providers who could

be expected to address the inmate's concerns); See also *Earl v. Racine County Jail*, 718 F.3d 689, 692 (7th Cir. 2013) (correctional officer defendants were not deliberately indifferent where, even if plaintiff had a serious medical condition, the officer's prompt call to the nurse undermined "any suggestion that he acted with the reckless or malicious intent required to sustain a deliberate-indifference claim[]" and the nurse herself informed the officers that because she did not find any evidence of a rash or bump, the plaintiff did not need different garments, and the officers appropriately deferred to that medical decision.).

The court will address each correctional officer Defendant in turn.

1. Actions of Harcar and Schultz

Examining the evidence of record, the court cannot say that there is a genuine issue of material fact regarding whether Defendants Harcar and Schultz were deliberately indifferent. Harcar first became aware of Plaintiff's complaints of pain around 9:30 in the morning.  Plaintiff argues that Harcar would have become aware much earlier, due to Harcar's shift time and the view the correctional officers' would have had of the inmates' cells.  However, such an inference is refuted by direct evidence from the record, via Harcar's deposition testimony, that she did not become aware of Plaintiff's complaints of stomach pain until 9:30.   The court is not required to draw every conceivable inference from the record, and those inferences that are supported only by speculation and conjecture will not defeat summary judgment.  See *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).  The record also reveals that Harcar exhibited great care for Plaintiff's condition.  Harcar, who had previously been pregnant with twins, took time to advise Plaintiff on her condition and relate her experiences to help Plaintiff.  Harcar took actions to make sure Plaintiff was comfortable.  Harcar herself, based on her observations, did not believe Plaintiff to be in any

-20-

great distress, yet when informed of Plaintiff's complaints, at both 9:30 and 11:30, Harcar contacted booking to advise them of Plaintiff's condition and receive instruction on how to proceed.  In fact, at 11:30, Harcar requested a first responder for Plaintiff, despite not thinking (again, based on her observations) that Plaintiff was in any distress and despite being told by Flowers that Nurse Sangster said nothing was wrong with Plaintiff.  When, at 2:40, Harcar saw that Plaintiff had passed blood, she immediately instructed Schultz to contact booking and advise them that Plaintiff was bleeding. While Hunter did aver that Harcar seemed "preoccupied or bored," that is completely belied by Harcar's actions as revealed in the deposition testimony.  Harcar did not ignore Plaintiff's complaints.  The record does not demonstrate that Harcar consciously disregarded a serious risk to Plaintiff's health, as her actions towards Plaintiff were not negligent, and certainly did not rise to the level of intentional wrongdoing or criminal recklessness necessary to establish deliberate indifference.  See *Holloway*, 700 F.3d at 1073.

Schultz's actions, similarly, do not constitute deliberate indifference.  Although he was informed early on September 11 that Plaintiff was in pain, Schultz himself did not observe or believe Plaintiff to be in any distress.  Once informed by Harcar about Plaintiff's complaints, however, Schultz attempted to reach Nurse Sangster and, despite not being able to reach the nurse on his first attempt, called around to the other housing units until he was able to speak with her, whereupon Sangster informed him that Plaintiff's condition was not serious.  When, at 2:40, he was informed by Harcar that Plaintiff was bleeding Schultz immediately called booking to report the situation. Schultz's comment to Hunter that Plaintiff was "not going to have the baby out of her ass" was deeply inappropriate.  His actions in that regard were offensive and display a level of callousness. However, this statement was apparently made after he had spoken with Nurse Sangster, who assured

-21-

him that Plaintiff's situation was not serious.  The court does not find that Schultz's reliance on Sangster's medical judgment was unreasonable under the circumstances.  The record reveals that Schultz contacted booking several times regarding Plaintiff's complaints, and even tracked down Nurse Sangster by calling other units before finally reaching her.  Schultz did not completely ignore Plaintiff's plight, and the record does not demonstrate that Schultz had a reason to believe Sangster was mistreating (or not treating) Plaintiff, as Schultz himself, based on his observations, did not believe Plaintiff to be in medical distress.  See *Arnett*, 658 F.3d at 755.  The record evidence does not show that Schultz knew of the serious medical risk to Plaintiff and consciously disregarded that risk.  Schultz's statement to Hunter about Plaintiff was callous, and if Hunter's averment that Schultz ignored her and worked on his computer is taken as true, it is arguable that Schultz's behavior qualifies as mere negligence.  However, when viewed in conjunction with the entirety of the record, Schultz's actions do not rise to the level of intentional wrongdoing or criminal recklessness needed for deliberate indifference at the summary judgment stage.  See *Holloway*, 700 F.3d at 1073.

2. Actions of Dyer and Calloway

The court further finds that the actions of Defendant Officers Dyer and Calloway were not deliberately indifferent to Plaintiff's serious medical needs.  Dyer, a trained first responder, had his first real interaction with Plaintiff's situation on September 11 when he spoke with Plaintiff's mother, Julia Moore.  Julia Moore did inform Dyer that Plaintiff was having pains, that it could be contractions, and that Plaintiff should probably go to the hospital.  At 11:30, Flowers instructed Dyer to go to Plaintiff's cell and provide first responder services to Plaintiff.  Before doing so, however, Dyer called Nurse Sangster, and informed her of Plaintiff's situation and his phone conversation

-22-

with Julia Moore.  During the phone call with Sangster, Sangster informed Dyer that she did not believe Plaintiff's complaints, saying Plaintiff was "full of shit" a lot of times.  Nurse Sangster told Dyer that, if Plaintiff did not appear to be in any serious distress, she could wait to see the doctor until the next day.  Dyer provided first responder services to Plaintiff and found all of Plaintiff's vitals to be in the normal range.  Plaintiff did not appear to either Dyer or Calloway to be in any serious distress.  According to Kenyatta Williams there was a disagreement between Dyer and Plaintiff while he was taking her blood pressure, but Williams did not recall the nature of the disagreement.  The evidence from the exhibits reveals that Dyer (and Calloway, whose interaction with Plaintiff was minimal): (1) apprised Sangster of the reports of Plaintiff's condition, and was told by Sangster the condition did not appear serious, but that he was to check on Plaintiff himself and call her back if he felt there was a problem; (2) took Plaintiff's blood pressure and checked her vitals, all of which appeared normal; and (3) did not observe Plaintiff to be in any serious distress.  Further, Dyer, following medical direction from Sangster, asked Plaintiff if she had noticed any bleeding, which she had not.  The court cannot say that Dyer and Calloway knew of and disregarded an excessive risk to inmate safety based on the facts known to them and their observations of Plaintiff that day.  Similar to Harcar and Schultz, taking the admissible evidence in the light most favorable to Plaintiff arguably could create a question of negligence on the part of Dyer and Calloway, but certainly does not indicate intentional wrongdoing or criminal recklessness.  See *Holloway*, 700 F.3d at 1073.

     3. Actions of Flowers

     Defendant Corporal Flowers' actions on September 11, 2011, did not constitute deliberate indifference.  Flowers never met or spoke with Plaintiff on that date.  Plaintiff cites to Flowers'

knowledge that Julie Moore had called JCDC and told officers that Plaintiff was experiencing stomach pains and needed to go to the hospital, along with Flowers' intemperate language when she told Harcar that Plaintiff  "can stop calling her mama because her mama can't do nothing up in here."  Those facts, however, do not establish deliberate indifference when compared to the other actions Flowers' took on September 11.  The record shows that around 9:30, when Flowers was first made aware of Plaintiff's complaint, Flowers instructed Schultz to call the nurse.  Flowers later spoke with Sangster face to face about Plaintiff and Sangster informed Flowers that she was aware of Plaintiff's condition, there was nothing wrong, and that Plaintiff would be seen the following day by the doctor.  On both occasions when informed by officers that Plaintiff was complaining of pain, Flowers took action.  In the first instance she instructed Schultz to contact the nurse.  In the second, after telling Harcar that Sangster said nothing was wrong with Plaintiff, Flowers did direct first-responder Dyer to go to Plaintiff's cell and attend to her.  Flowers' actions indicate that she relied on the medical opinion of Nurse Sangster and was not aware of an excessive risk to Plaintiff's safety.  It was not unreasonable for her to rely on Sangster's opinion.  Further, her actions in directing officers to either contact the nurse or attend to Plaintiff indicate that Flowers did not ignore or disregard any risk to Plaintiff's safety, but rather was responsive and attentive to Plaintiff's complaints.  Flowers' actions were not criminally reckless and did not amount to intentional wrongdoing, and thus were not deliberately indifferent.  See *Holloway*, 700 F.3d at 1073.

4. Correctional Officer Defendants' Reliance on Nurse Sangster- Harcar's statement about how an LPN was an RN's little flunky

Plaintiff argues that the correctional officer Defendants' reliance on the judgment of Nurse Sangster was unreasonable.  Plaintiff argues that because Sangster did not see Plaintiff in person,

there was no actual assessment upon which correctional officer Defendants could rely. Plaintiff also points to the "obvious animus" Sangster had towards Plaintiff and Harcar's statement that an LPN was basically a "flunky" for the RN. Seventh Circuit precedent, however, holds that correctional officer defendants are "'entitled to defer to the judgment of jail health professionals so long as [they] did not ignore [the prisoner].'" *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012), quoting *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). The only exception to this rule is that nonmedical officers may be found to be deliberately indifferent if they know or have reason to believe that the medical staff are mistreating (or not treating) a prisoner. *King*, 680 F.3d at 1018. Here, as established above, correctional officer Defendants did not ignore Plaintiff. Further, they did not have reason to believe that Sangster was mistreating or failing to treat Plaintiff. The correctional officer Defendants were not trained medical personnel, nor were they specifically trained to determine the difference between normal pregnancy pains and labor, so they lacked the capacity to judge whether Plaintiff was genuinely experiencing labor as opposed to normal pregnancy pains. See *King*, 680 F.3d at 1018. While Sangster may have displayed skepticism of Plaintiff's complaints, Sangster advised that Plaintiff would see the doctor the next day. She also directed Dyer to attend to Plaintiff and report back to her if he felt she was in serious distress. Sangster also inquired of Dyer whether Plaintiff was bleeding. The actions of the correctional officer Defendants indicate they were deferential to, and responsive to, the decisions, orders and opinions of Nurse Sangster, and the record does not show that they had reason to believe Sangster was mistreating, or failing to treat Plaintiff. See *King*, 680 F.3d at 1018. Thus, correctional officer Defendants were entitled to defer to Nurse Sangster's judgment. See *Earl*, 718 F.3d at 692.

5. Plaintiff's Case Law and *Townsend*

In support of her argument of deliberate indifference on the part of Defendant Officers Harcar, Schultz, Calloway, and Dyer, Plaintiff cites to *Cobige v. City of Chicago*, 2009 WL 2413798 (N.D. Ill. Aug. 6, 2009) and *Doe v .Gustavus*, 294 F.Supp.2d 1003 (W.D. Wis. 2003). Both cases are distinguishable from the instant case. First, in *Cobige*, the defendant officers did nothing to respond, in any way, to the deceased plaintiff's complaints of severe abdominal pain. The court in *Cobige* noted that the officers were repeatedly informed of the plaintiff's condition, "yet never checked on how she was doing and decided not to send her to a hospital." *Cobige*, 2009 WL 2413798, at *9. The only action taken was to tell other officers that the plaintiff was sick and to note it on the lockup log, which the court found "'so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded [the plaintiff's] needs.'" *Cobige*, 2009 WL 2413798, at *9, quoting *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). Here, in contrast, the correctional officer Defendants were responsive to Plaintiff's complaints. They contacted superiors to report the complaints, consulted the jail nurse on duty and relied on her opinion, and provided first responder treatment to Plaintiff.

In *Doe*, the plaintiff alleged deliberate indifference and argued that the staff at the prison ignored her cries for help and medical needs while she went into labor. The plaintiff was placed into a segregation unit, called a "dumb bitch" after she had a vomiting spell in segregation (which the defendant officer threatened to make her clean up if she did it again), and her requests for nursing assistance and pain medication were refused. *Doe*, 294 F.Supp.2d at 1010. The plaintiff was also refused sanitary pads and ice following her delivery. Another correctional officer defendant was alleged to have ignored the plaintiff's frequent cries of pain, minimized the situation, and to have

allowed four hours to pass between the time the plaintiff's water broke and the time the nurse came to test for amniotic fluid.  Further, there was an allegation in *Doe* that a correctional officer defendant actually engineered the plaintiff's placement in segregation, which led to inadequate medical care.  *Doe*, 294 F.Supp.2d at 1010.  The facts in the instant case are nowhere near as egregious.  Here, Plaintiff was not only not placed in segregation, but was allowed out of her cell at times by Harcar and allowed to be accompanied by Hunter and Williams.  Plaintiff's cries of pain did not go ignored, but were responded to by officers.  Dyer checked Plaintiff's vitals and consulted with the nurse.  Plaintiff was provided sanitary pads.  Plaintiff's water never broke, but at the first sign of blood, the nurse was immediately contacted and the order was given for Plaintiff to be taken to the hospital.  Both *Doe* and *Cobige* are distinguishable from the facts of the instant case.

Plaintiff also cites to *Egebergh v. Nicholson*, 272 F.3d 925 (7th Cir. 2001) to support her argument that Defendant Flowers was deliberately indifferent.  In *Egebergh*, the deceased plaintiff informed the officers at his booking that he was an insulin-dependent diabetic.  The police had his insulin brought to the station, where he was given a shot the night before his bond hearing.  The next morning the supervising officer ordered the plaintiff to be taken to his bond hearing.  The plaintiff informed the transporting officer that he needed another insulin shot.  The transporting officer relayed the request to the supervisor, who denied the request.  The plaintiff's condition deteriorated throughout the day and he died that night as a result of missing his shot.  The supervisor knew that diabetics could be seriously harmed by being deprived of insulin.  The court found that a jury could infer the supervisor's actions qualified as deliberate indifference.  *Egebergh*, 272 F.3d at 928.  Unlike the situation in *Egebergh*, Flowers only knew that a pregnant inmate was experiencing pain and that the nurse was aware of the complaint.  In *Egebergh*, the supervisor directly refused to

-27-

administer insulin to the plaintiff, all the time knowing the importance of regular injections to diabetics. *Egebergh*, 272 F.3d at 927-28. Here, Flowers was apprised by her subordinate officers and the on-call nurse that Plaintiff was not in any distress and that Plaintiff's condition was not serious. Flowers did not direct any conduct that caused or resulted in a constitutional violation.

Defendants cite to an Eleventh Circuit case, *Townsend v. Jefferson County*, 601 F.3d 1152 (11th Cir. 2010), in support of their argument they were not deliberately indifferent to Plaintiff's serious medical needs. In *Townsend*, the plaintiff jail detainee suffered a miscarriage and alleged deliberate indifference to her serious medical need against two jail deputies. The Eleventh Circuit concluded that no reasonable jury could conclude the deputies knew that plaintiff's situation was an emergency because they had been told by a medical professional, the nurse on duty, that the plaintiff was not presenting an emergency. *Townsend*, 601 F.3d at 1159. The court noted that while the plaintiff had not been treated by a medical professional, she had seen and spoken with the nurse. The deputies were aware that the nurse had determined the plaintiff's condition was not an emergency and the nurse would consult a doctor. *Townsend*, 601 F.3d at 1158-59. The court concluded that the plaintiff "ha[d] not presented evidence that her situation was so obviously dire that two lay deputies must have known that a medical professional had grossly misjudged [plaintiff's] condition." *Townsend*, 601 F.3d at 1159. Although in this case Sangster never actually met and spoke with Plaintiff on September 11, 2011, we do find the *Townsend* court's reasoning persuasive. Here, correctional officer Defendants' relied on Nurse Sangster's evaluation of Plaintiff's situation based on the facts she had been told. Plaintiff has not presented evidence that her situation was so obviously dire that the lay deputies must have known that Sangster, a medical professional, had grossly misjudged Plaintiff's condition. See *Townsend*, 601 F.3d at 1159.

In sum, the court concludes that Plaintiff has not met her burden in showing that a genuine issue of material fact exists as to whether the correctional officer Defendants were deliberately indifferent to her serious medical needs.  Plaintiff has not shown that Defendants' conduct rises to the level of intentional wrongdoing or criminal negligence.  The actions of the correctional officer Defendants did not show "total unconcern" for Plaintiff's welfare in the face of serious risks.  See *Rosario*, 670 F.3d at 821.  The correctional officer Defendants were responsive to Plaintiff's complaints and reasonably relied on the judgment of a medical professional.  See *Earl*, 718 F.3d at 692.  They were not plainly incompetent, and the court believes that officers of reasonable competence could disagree on whether or not their actions were constitutional, thus immunity should be recognized.  See *Gruenberg*, 697 F.3d at 578.  Plaintiff has not shown that the facts make out a constitutional violation, therefore qualified immunity applies to the correctional officer Defendants.  See *Abbott*, 705 F.3d at 713.  Summary judgment is GRANTED in favor of Defendants Harcar, Schultz, Dyer, Calloway, and Flowers on Count I of Plaintiff's Fourth Amended Complaint.

II.    *Whether Defendants Bukowski, Dayhoff, and Long Are Entitled to Summary Judgment on Plaintiff's Municipal Policy Claim*

Plaintiff claims, in Count II of the Fourth Amended Complaint, that the policies, customs, or practices of the JCDC amounted to deliberate indifference to Plaintiff's Fourteenth Amendment Due Process rights.  Plaintiff claims that Defendants Sheriff Bukowski and Drs. Dayhoff and Long, as administrators of the JCDC, failed to hire or properly train medical staff and correctional officers on handling or treating pregnant inmates.  Plaintiff also alleges that the JCDC had various other policies that contributed to the deaths of her twins.  Defendants argue that: (1) Defendant Drs. Dayhoff and Long are entitled to summary judgment because they are not the final decisionmakers

for the JCDC; and (2) Defendant Sheriff Bukowski is entitled to summary judgment because Plaintiff has failed to establish municipal liability.

A.     Whether Defendant Drs. Dayhoff and Long Are Liable Under *Monell*

Defendants argue that Drs. Dayhoff and Long are entitled to summary judgment on Plaintiff's *Monell* claim because they are not final decisionmakers for the JCDC, and thus municipal liability could not apply to them under *Monell*.  *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (Under *Monell*, the question is whether an official is a policymaker in a particular area or issue, and officials with final decisionmaking authority are deemed policymakers for *Monell* purposes).  Plaintiff, on page 52 of her Response (#101), concedes that summary judgment should be granted for Defendants Drs. Dayhoff and Long.  Therefore the court GRANTS the motion for summary judgment on Count II with respect to Drs. Dayhoff and Long.

B.     Whether Plaintiff Has Established Municipal Liability for Defendant Bukowski

Plaintiff argues that Defendant Sheriff Bukowski, as the final decisionmaker for the policies employed at JCDC, was deliberately indifferent in failing to train the correctional officer Defendants to recognize prenatal emergencies, while giving them responsibility for making emergency medical decisions, which exacerbated the situation and contributed to their failure to timely transport Plaintiff to the hospital, which lead directly to the death of her twin infants.  Defendants argue that Bukowski is entitled to summary judgment because there was no express policy at JCDC that caused the alleged constitutional violation when enforced and there was no widespread practice that was so permanent and well settled so as to constitute a custom with the force of law that caused the alleged violation.

Under 42 U.S.C. § 1983 municipal liability may not be established for an injury solely through the actions of municipal employees or agents, but rather the injury must be the result of the execution of a local government's policy or custom, whether made by the municipality's lawmakers or by those whose edicts or acts may be fairly said to represent official policy. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). "To establish municipal liability, a plaintiff must show the existence of an 'official policy' or other governmental custom that not only causes but is the 'moving force' behind the deprivation of constitutional rights." *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012), quoting *Estate of Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). "A plaintiff can establish an official policy through '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final decisionmaking authority.'" *Teesdale*, 690 F.3d at 834, quoting *Sims*, 506 F.3d at 515. In the instant case, Plaintiff argues that an official policy has been established through the first two methods, and the court will address each method in turn.

1.      Whether the JCDC Had an Express Policy

Plaintiff does not state explicitly in her Fourth Amended Complaint what "express policy" Defendant Bukowski employed at JCDC that led to the alleged constitutional violation. Rather, Plaintiff lists ten separate "policies, customs, and/or practices" that "were the moving force behind [the alleged] Constitutional violations." Most of the listed "practices or policies" are alleged failures by Bukowski to have a certain practice or policy in place that would have prevented the alleged constitutional injury. "The express policy theory applies, as the name suggests, where a policy

-31-

explicitly violates a constitutional right when enforced." *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005).   Under that type of claim, one application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability.  *Calhoun*, 408 F.3d at 379-80. However, another way of complaining about an express policy is to object to omissions in the policy, but the Seventh Circuit has noted that "it is more confusing than useful to distinguish between claims about express policies that fail to address certain issues, and claims about widespread practices that are not tethered to a particular written policy." *Calhoun*, 408 F.3d at 380.  Both of those types of claims require more evidence than a single incident to establish liability. *Calhoun*, 408 F.3d at 380.  Therefore, in this subsection, the court will only address Plaintiff's claims that an express policy of the JCDC, when enforced, explicitly violated her constitutional rights.

The court agrees with Defendants that, upon a reading of Count II of the Fourth Amended Complaint, the only allegations that fit an "express policy" claim are the policies that do not have medical staff physically present at JCDC on the weekends and evenings but instead relying on an LPN to make treatment decisions by phone and the policy that gives decision-making authority to an LPN like Defendant Nurse Sangster.  The court further agrees that the policies, when enforced, do not explicitly violate Plaintiff's constitutional rights.  Policy Manual Section 625 (Nurse On-Call) provides that health staff will be on site at the jail on Saturdays, Sundays, and holidays, as needed. Otherwise, on-call nurses are available at that time.  Therefore, Plaintiff has not provided any evidence that there is an express JCDC policy providing that medical staff not be physically present on the weekends.  Otherwise, the policy provides that on-call nurses be available at that time.  While there does not seem to be an express policy requiring physical presence during the evenings,

-32-

Plaintiffs have cited to no case law to suggest that such a policy would violate the Eighth Amendment if enforced. Further, the incident at issue did not take place during the evening.

Plaintiff also takes issue with the "practice or policy which gives decision-making authority to [Nurse Sangster], a licensed practical nurse (LPN)[.]" Plaintiff argues that an LPN only has the training to work under the direct supervision of a registered nurse or doctor, and that Sangster's training and experience did not qualify her to make decisions regarding a person's medical treatment without consulting a doctor or registered nurse. However, the JCDC policies provide for just that. Section 625 requires an on-call nurse to contact a Physician Assistant or physician with any questions or guidance, as needed. An on-call nurse is also required to contact the on-call physician to discuss inmate needs and medical decision making, as needed. Further, Section 601 (Medical Services Administration) provides that all medical personnel must be licensed, registered, or certified in their respective fields and only perform duties within the scope of their particular license. In this case, there is no evidence Sangster consulted a doctor regarding Defendant's medical treatment, however the policy at issue requires the on-call nurse to contact a doctor or registered nurse, as needed, and further the on-call nurse is required to contact the on-call doctor to discuss inmate needs and medical decision-making. Plaintiff's dispute is not with the policy itself, but rather with the actions of Defendant Sangster. Further, again, Plaintiff has not cited to any case law to support her claim that the policy provisions at issue explicitly violated her constitutional rights when enforced. Finally, the court would note that Plaintiff, in her Response (#101), did not respond to Defendant's argument on this point and the general rule in the Seventh Circuit is that a party's failure to respond to an opposing party's argument implies concession. *MCI Worldcom Network Services, Inc. v. Atlas Excavating, Inc.*, 2006 WL 3542332, *3 (N.D. Ill. Dec. 6, 2006); See *Keri v.*

*Board of Trustees of Purdue University*, 458 F.3d 620, 643, n.7 (7th Cir. 2006), reversed on other grounds by *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). The court finds that JCDC's express policies did not explicitly violate a constitutional right when enforced.

2.     Whether Defendant Bukowski Had a Practice or Custom Constituting An Official Policy That Resulted In a Constitutional Violation

Plaintiff argues that Defendant Bukowski failed to properly train JCDC employees on how to properly manage, treat, or respond to pregnant, or high-risk pregnant, inmates and their serious medical needs, including a practice of failing to promptly transport pregnant inmates to the hospital when they show signs of labor. Plaintiff alleges these customs or practices amount to deliberate indifference of her Fourteenth Amendment Due Process rights. Defendants have moved for summary judgment, arguing that Plaintiff has failed to produce any evidence from which a jury could conclude that there was a widespread practice or custom of inadequate management of pregnant inmates, failure to respond in a proper and timely fashion to their serious medical needs, or a failure to promptly transport them to the hospital when they are in labor. Defendants also argue that there is no indication in the record that Bukowski was aware of any previous incidents of inadequate treatment of pregnant inmates (assuming there were any) or that he failed to respond appropriately to such incidents.

"When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003). Similarly, if a plaintiff is alleging that an "omission" in

an express policy caused the constitutional violation, the claim requires more evidence than a single incident to establish liability.  *Calhoun*, 408 F.3d at 380.  The Seventh Circuit has noted:

> "Both in the 'widespread practice' implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event.  If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident that *Brown* [*Board of the County Commissioners of Bryan County v. Brown*, 520 U.S. 397 (1997)] held cannot support municipal liability."  *Calhoun*, 408 F.3d at 380.

Here, Plaintiff cannot cite to more than the current incident as evidence of a widespread practice or custom or omission in policy.  Plaintiff, in her Response (#101), does not dispute Defendants' argument.  Plaintiff's failure to address that point may be interpreted as an implicit concession.  Therefore, because Plaintiff cannot produce evidence of more than a single incident, she cannot establish liability under the omission or widespread custom or practice theory of municipal liability based on deliberate indifference.  See *Calhoun*, 408 F.3d at 380; *Palmer*, 327 F.3d at 596.

Plaintiff, however, argues that her alleged constitutional violation falls under the narrow exception to the single incident rule most recently articulated by the U.S. Supreme Court in *Connick v. Thompson*, 131 S.Ct. 1350 (2011), where it stated:

> "In *Canton* [*City of Canton v. Harris*, 489 U.S. 378 (1989)], the Court left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference. [citation omitted]

The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture the fleeing felons without training the officers in the constitutional limitation on the use of deadly force.  [citation omitted] Given the known frequency with which police attempt to arrest fleeing felons and the 'predictability that an officer lacking specific tools to handle that situation will violate citizens' rights,' the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights. [citation omitted] The Court sought not to foreclose the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Connick*, 131 S.Ct. at 1361.

The court disagrees with Plaintiff's assertion that "the need to train correctional officers to recognize emergency situations involving pregnant inmates can be said to be so obvious" that the JCDC's failure to do so constituted deliberate indifference.  As noted above, the U.S. Supreme Court in *Canton* discussed a situation where the consequences from a municipality's failure to train would be so obvious that a pattern of indifference would not be required.  *Canton*, 489 U.S. at 390, n.10. Here, however, the risk here of a constitutional violation from any possible failure to train is not the same as a city arming its police force with firearms and deploying the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force, and thus, nothing about this case's alleged constitutional violation or the resulting

-36-

harm to Plaintiff was "patently obvious" or "predictable."  See *Johnson v. Cook County*, 526

Fed.Appx. 692, 2013 WL 2005236, *4 (7th Cir. 2013).  In this instance, the JCDC had policies in

place for handling pregnant inmates and emergency medical situations.  Section 617 provides that

in case of an emergency with a pregnant inmate, correctional officers are to notify their shift

supervisors and the on-call nurse if medical personnel are not present at the jail, and the medical

department will determine whether the inmate should be sent to the hospital.  Plaintiff argues that

the correctional officers should be trained to recognize such emergencies.  However, the correctional

officers are not medical professionals, and not capable of making such medical judgments.  Rather,

using their own training, life experience, and common sense, the policy requires officers to use their

best judgment on whether an inmate is having a problem, without requiring the officers to use any

sort of "medical discretion" which could require them to overrule medical professionals on medical

grounds.  Here, the officers repeatedly informed their supervisors and the medical professional on-

call of Plaintiff's complaints.  The court finds that the policies in place at JCDC were reasonable and

sensible, and that the consequences of any failure to further train correctional officers, as alleged in

the Fourth Amended Complaint, were not so "patently obvious" that Defendant Bukowski could be

liable under § 1983 without proof of a pre-existing pattern of violations.  See *Connick*, 131 S.Ct. at

1361.  The court is not persuaded by Plaintiff's citation to *Wallace v. Hounshel*, 2009 WL 734714

(S.D. Ind. March 19, 2009).  In *Wallace*, the court found that the defendant county did not have a

sound training program for its jail officers regarding handling of inmate medical issues.

Specifically, the court found that officers did not receive any specific training regarding the proper

use of the Chest Pain Protocol, but rather received "general" instructions regarding the use of

protocols.  The court found that "general training may well have been appropriate if the protocols

were self-explanatory and did not require the exercise of any medical discretion." *Wallace*, 2009 WL 734714, at *11. The Chest Pain Protocol, however, did require the exercise of discretion in that it required the officer to determine whether an inmate was experiencing cardiac chest pain, which required physician referral, or chest pain related to an injury or muscle strain, which did not. The court found no evidence that the jail had a policy in place that required its officers to be trained on how to make that type of determination. The court concluded that "[a] reasonable jury could find that the need to train jail officers with regard to handling an inmate's complaints of chest pain was obvious and that the County disregarded that obvious need in deliberate indifference to a substantial risk to its inmates." *Wallace*, 2009 WL 734714, at *11.

In contrast, in the instant case, Section 617 did not require the use of medical discretion. If a pregnant inmate was having an emergency, the officers were required to notify their shift-supervisor and the on-call nurse if medical personnel were not present at the jail, which is what happened in this case. The officers are not required to assess between the different types of pregnancy pains in the same way that the officers in *Wallace* had to assess different types of chest pains without specific training on how to recognize those pains. Further, Plaintiff again is arguing that correctional officers be given medical training on how to handle pregnant inmates, so that they may use medical discretion, while at the same time arguing that Defendant correctional officers should not have relied on the medical discretion of Nurse Sangster, a medical professional who was "only" an LPN.

The Supreme Court has cautioned that the single incident exception is "rare." *Connick*, 131 S.Ct. at 1361. The risk from Defendant Bukowski's alleged failure to train, in light of the JCDC policy at issue here, was not so "patently obvious" or "predictable" that a pattern of indifference

-38-

would not be necessary to show deliberate indifference.  *Connick*, 131 S.Ct. at 1361.  Thus, to

demonstrate deliberate indifference based on a widespread practice or custom or omission in policy,

Plaintiff must provide the court with more than a single incident.  See *Calhoun*, 408 F.3d at 380.

Because Plaintiff can not do that, summary judgment must be granted in favor of Defendant

Bukowski on Count II.

      III.  *Plaintiff's Wrongful Death (Counts III-IV) and Loss of Society (V-VI) Claims*

      Plaintiff has raised four state law counts alleging wrongful death and loss of society.

Defendants argue that they are entitled to summary judgment on the wrongful death counts because

deliberate indifference and wanton and willful conduct, which is required to overcome governmental

immunity in wrongful death claims, are treated the same and have not been proven in this case.

Defendant also argues that judgment should be granted on the loss of society claims because those

claims are not a cause of action in and of themselves in Illinois, but are rather an element of damages

in wrongful death claims.

      Plaintiff alleges, under Illinois state law, that Defendants caused the wrongful death of her

infant twins by failing to take her to a hospital in a timely manner due to Defendants' deliberate

indifference of medical needs.  However, in her Response (#101) Plaintiff admits that "Defendants

correctly state that Section 4-105 of the Illinois Tort Immunity Act limits the liability of public

employees for injuries proximately caused by the failure to obtain medical care for inmates in their

custody."  Section 4-105 states:

        "Neither a local public entity nor a public employee is liable for injury

        proximately caused by the failure of the employee to furnish or obtain medical care

        for a prisoner in his custody; but this Section shall not apply where the employee,

acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care.  Nothing in this section requires the periodic inspection of prisoners."  745 ILCS 10/4-105 (2012).

Willful and wanton conduct is defined in Illinois as "a course of action which shows actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."  745 ILCS 10/1-210 (2012).  The Seventh Circuit has noted that the willful and wanton standard is "remarkably similar" to the deliberate indifference standard. *Williams v. Rodriguez*, 509 F.3d 392, 405 (7th Cir. 2007).  Plaintiff, in her Response (#101, p. 51), admits "Seventh Circuit courts addressing Section 4-105 immunity first address the plaintiff's deliberate indifference claim and then grant or deny such immunity in conformity with their deliberate indifference ruling."  See *Williams*, 509 F.3d at 405.  This court has already concluded that Defendant correctional officers did not act with deliberate indifference toward Plaintiff.  Therefore, for the reasons discussed in Section I of this Opinion, judgment is granted in favor of Defendant correctional officers on Counts III and IV of Plaintiff's Fourth Amended Complaint.

Plaintiff also alleges loss of society.  However, as noted in Defendant's Partial Motion for Summary Judgment (#97), loss of society in Illinois is not a cause of action in and of itself, but rather is an element of damages in a wrongful death claim.  See *Bullard v. Barnes*, 469 N.E.2d 1228 (Ill. 1984).  Plaintiff did not respond to this argument in her Response.  Plaintiff did not mention the loss of society counts at all in her argument in the Response.  Judgment has already been entered

in correctional officer Defendants' favor on the wrongful death counts.  Therefore, as loss of society is not a cause of action in and of itself, judgment must be entered in favor of all Defendants on Counts V and VI.

IV.  *Plaintiff's Medical Malpractice Claim (Count VII) Against Correctional Officer Defendants*

Plaintiff, in Count VII, appears to allege an Illinois medical malpractice claim against both Defendant Nurse Sangster and the correctional officer Defendants.  Defendants move for summary judgment in favor of the correctional officer Defendants, arguing that the correctional officer Defendants are not medical professionals and are thus not liable for medical malpractice.  Plaintiff did not respond to this argument in her Response (#101).  The Illinois Supreme Court has described medical malpractice, or "healing art" malpractice, as "a broad category that is not confined to actions against physicians and hospitals but rather, [] may also include actions against other health professionals such as dentists or psychologists." *Bernier v. Burris*, 497 N.E.2d 763, 767 (Ill. 1986). That broad description does not include correctional officers with no professional medical training. The correctional officers are not "health professionals."  Plaintiff has offered no rebuttal argument on this issue.  Judgment is entered on Defendant correctional officers on this count.

CONCLUSION

The court recognizes that this is a tragic case, and it is likely that everyone involved in the incident on September 11, 2011, at the JCDC regrets the deaths of Plaintiff's twin infants later that day at Provena St. Mary's Hospital.  But the facts of this case, with regard to the correctional officer Defendants, Sheriff Bukowski and Drs. Dayhoff and Long, do not support liability under the

Constitution based on Seventh Circuit and Supreme Court case law. Accordingly, Defendant's Partial Motion for Summary Judgment (#97) is GRANTED in full.

IT IS THEREFORE ORDERED:

(1) Defendants' Partial Motion for Summary Judgment (#97) is GRANTED in full.

(2) Judgment is entered in favor of Defendants Dayhoff, Long, and Bukowski on Count II. Judgment is entered in favor of Defendants Harcar, Schultz, Calloway, Dyer, and Flowers on Counts I, III, IV, V, VI, and VII. Judgment is entered in favor of Defendant Sangster on Counts V and VI.

(3) Counts I, III, IV, VII, and VIII remain pending against Defendants Sangster and Kankakee County.

(4) Defendants Bukowski, Dayhoff, Long, Harcar, Schultz, Dyer, Calloway, and Flowers are terminated from this case.

(4) This case remains set for a jury trial on Tuesday, April 29, 2014, at 9:00 am in Courtroom A. The final pretrial conference remains set for April 4, 2014, at 1:30 pm in Courtroom B. Pretrial motions are due to the court by March 14, 2014.


ENTERED this 4th day of December, 2013


s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE